This morning is 5-170-309 Cedarhurst of Bethalto Real Estate v. Village of Bethalto Are you ready to proceed? Yes ma'am Okay, when you're ready Mr. Mollett Good morning. My name is Greg Mollett. I represent the plaintiff Cedarhurst of Bethalto LLC. This morning I'm here to ask this panel to reverse a dismissal with prejudice entered in the trial court in favor of the defendant under section 2619 and section 2615. It was a combined motion, wasn't it? Yes, Your Honor, it was. I'd like to address the 2619 dismissal first. The dismissal was entered pursuant to section A-9 and there was an affirmative matter advanced by the defendant. That single affirmative matter was the issue of standing. The defendant asserted that although the plaintiff was not required to plead standing, once it had been put in issue by the defendant, that the plaintiff was required to plead an individualized harm or face dismissal on standing grounds. Do you disagree with that concept? I do under the limited exception Tell by the way you're saying it, maybe you disagree with it. I do under what I believe is a limited exception to that rule in Illinois, which is controlling the Illinois Supreme Court precedent, Your Honor. And what is that? The doctrine says that if a party comes to court to seek to compel public officials to perform a duty owed to the public at large, that individual comes forward to advance the claims of the public generally. And any member of the public can come forward to advance that claim and need not prove individualized harm under that limited set of circumstances. And you are citing what Supreme Court case? The original Supreme Court case actually predates the building of this courthouse. That's the duck. Wright County v. Metz, 1849 is an Illinois Supreme Court precedent. That precedent originally formed the doctrine. It has been repeated and applied. The case that was brought before Judge Alfeld on the motions to dismiss was the more recent case, which was Faulkner v. Harris, which was a 1903 Supreme Court decision. More recent is relative. We're into the 20th century at that point. That proposition was again addressed and re-repeated and reapplied in the Supreme Court case of Gamber in 1920. Retail liquor dealers in 1943. And has been applied by the appellate courts of Illinois on an ongoing and unbroken basis in the 1940s, 1959, 74, 88. And was discussed as good law as recently as in a dissenting opinion in the second district in the American Federation case in 2002. Okay. How do you distinguish the Supreme Court case of Gamber? Gamber, Your Honor, was a zoning case that involved an individual in town who said, one of my neighbors is seeking to have their property rezoned. If my neighbor's property is rezoned, it may affect me. What the court said was, if you say it affects you personally, that rezoning decision as to your neighbor, you must come forward and plead an individualized harm. You can't merely come forward and say, because I live in town, the rezoning of my neighbor's property is of interest to me, so on behalf of the town, I want to challenge the zoning. If this case involved the plaintiff coming forward and saying, if the senior living facility that was going to be built was going to be rezoned from airport to residential to facilitate this, if the plaintiff had come forward and said, that act of rezoning is going to affect me, I would have had to, the plaintiff would have had to plead an individualized harm. Are you saying it has to be a zoning case? Absolutely not, Your Honor. The cases that I just mentioned to the court by ear, the Supreme Court precedents, they're across the field of factual circumstances. What is core to all of those cases is the role of the plaintiff in coming forward. They all have the same unifying factor. I am here to say there is a public duty owed, and I am here in Mandamus seeking to compel the performance by public officials of that public duty. There's an extensive discussion of the history of the doctrine and applying it outside the fact pattern of the original case, Metz, to a unique fact pattern involved in the Harris decision. Retail Liquor, Gambler v. Board of Gallatin County, Hill v. Butler, these cases, again, differing underlying fact patterns, differing laws and ordinances, different theories under which there was a public duty, but common to them all was a plaintiff who said there is a duty owed to the public. I am here as a member of the public seeking to compel the performance of that public duty. That exists a very narrow quarter under the overarching rules of Illinois standing law, which says in every other situation that I'm aware of, you must have individualized harm. At the Supreme Court, that says this is an exception. The defendant has not argued that any of these cases have been overruled or are no longer the law. They can't because Faulkner v. Harris has never been overruled, and it remains the law of the land. Under that section, the plaintiff was not required to plead individualized harm. Therefore, a dismissal on that grounds was improper. As to the remaining two counts, not mandamus, there were three counts, declaratory judgment and injunction. These mandamus cases did not involve declaratory judgments or injunction. Therefore, the parties disagree as to how the court should have ruled on 2619 as to those claims. The only guidance I could find was a second district appellate decision called Tanner v. Solomon. It was a declaratory judgment case, again, seeking on behalf of the public to get a declaration that public officials had a duty to act in the public interest. In that court, the appellate court said we see no difference between this and a mandamus case on the same facts, so we do not find individualized harm is required in a declaratory judgment case, again, within that narrow corridor, public officials being compelled to perform public duties. I could not find a case on injunction. I am here to argue that if that principle itself holds in mandamus and holds in declaratory judgment, if the injunction is focused on that same issue, seeking to enjoin public officials to compel a public duty owed to the group at large, there would be standing without showing a harm as to the injunction claim. If that's true, with the 2619, dismissal was improper and should be reversed. In their appellate brief, and I assume in argument today, defendants will argue there have been other more recent Supreme Court cases on standing in general, Greer in particular, and they also referenced the Naughton case. In neither of those decisions did the Supreme Court, although they had the opportunity to take up Metz or Faulkner, did they overrule those cases? They merely distinguished them. Naughton, the primary case on which defendants rely, was a reported class action by somebody who said, I think all applicants for benefits for public aid should be paid from the day of their application, not the day that application is granted. There was almost no discussion of these cases other than to say that case was factually an apposite to Faulkner. It in no way undermined or overruled Faulkner. Another argument I think you'll hear on 2619 is, in his order, Judge Alfield, at the end of the 2619 section, put in a single sentence that said, and even if there was standing, I find no duty. Find no what? No duty. Duty, as I'll discuss in a moment under 2615, is one of the elements that the plaintiff needed to prove, needed to state the facts to justify, to sustain a claim. But under 2619, by filing a 2619 motion, the defendant was agreeing, for purposes of that motion, that the facts in the plaintiff's petition would be deemed true and that the elements were satisfied. So a plaintiff or defendant can- Let me ask you this. Yes, ma'am. These zoning cases, such as the one you're talking about, there's a lot of latitude given. Permits, for example, applications have to be made, justifications have to be shown. I'm sure even for your client, that when they built, that there was a lot of latitude. So I'm concerned when you have a duty that you can identify, such as in these old cases that you're talking about, where there's absolute duty, there's no latitude, versus what you're talking about and perhaps the judge was talking about, is how do we get our hands around this duty? What is it that we've violated? Because, for example, the applications may or may not have even come before us, you know, in these senior care centers, for example. So how does a court like ours get our hands around this duty? There's no one duty, for example. It's a fact and circumstances analysis, Your Honor. But what you're saying is it's a case-by-case analysis, whichever case it is. But how in this case do you identify that one duty that's mandatory? I think the older cases recognize some kind of mandatory public interest duty. What is it here that's mandatory? In this particular case, the village of Bethalto enacted the 2000 comprehensive plan and implemented that plan into their zoning code. But plans, those plans are just plans. There's nothing that says a comprehensive plan has to be followed to the T because circumstances change. There is room for a village to make changes to the plan, and Your Honor is absolutely correct, pursuant to 65 ILCS 5-11-12-6, which talks about the comprehensive plan. But the language it uses is it says a comprehensive plan in and of itself is advisory only, unless it is implemented by ordinance. And there are two cases, the Smart Grove case and City of Chicago v. Living Word. In those cases, that doctrine was applied in Illinois appellate courts. And what they said, let's use Living Word as an example. In Living Word, the applicant sought a special use permit. The city denied it. What the city said was our comprehensive plan provided the basis for denying a special use permit. The appellate court said no. They said looking at the statute, your comprehensive plan is only advisory unless you have implemented it through an ordinance. Even if you've implemented it, the plan discusses the overlay. Airport overlay district, yes, Your Honor. District, but it says it recommends one. That's not even if it was implemented. It's just a recommendation. When taken as a whole, and I believe the entire comprehensive plan was implemented, the section as to airport overlay district says that if you build residential facilities within certain noise contours. Wait, I'm talking about the fact, not the details, but the fact that it was recommended as an approach, one of, I guess, just an example of one of the possibilities. So how do you enforce that? I read the comprehensive plan to say they must do a compatibility analysis. They said we are building on our experience. 132 residential homes had to be forcibly repurchased and demolished because they were in the shadow of this airport and they were subject to public health, welfare, and safety because of noise considerations. Building on that, as the comprehensive plan does, it says going forward, we obligate ourselves to prospectively analyze development before it's built to determine if it's compatible with the noise contours. And they don't speak only in general terms. They say we are going to adopt and apply federal aviation rules that exist independently and incorporate those in particular. But is that really the essence of your argument, is that you want them to do a noise study? I mean, is that really the essence of what was found here? They had an obligation to do a pre-construction compatibility analysis as admitted by the mayor. Okay, but is that what you were seeking? Yes, ma'am. That's all you were seeking? We were not seeking to bar the project. We are saying that that project was subject to a pre-construction compatibility analysis. And if it is found to be in the 65 LDN noise contour, the village still has two choices. They can do a village study that says despite the injury. So you're going down the line about and then they can do this or then they can do that. You've gone beyond that one narrow exception, in my view, that you indicated all the case law identifies. It's very narrow to get you standing to come in and interfere with public. It's like you're a private attorney general here, you know, and that's a very narrow exception. So it seems to me that what you were asking for goes way beyond that narrow exception because you're asking for more. It involves latitude and decision making. We are not attempting to police the mechanism of how they come up with the result. Merely that they have committed to do a pre-construction compatibility analysis. That's all we're saying. The mayor has agreed. The mayor admitted it was subject to compatibility. And, in fact, based on the facts of this case when they were presented in his official capacity, he said this project is incompatible and should be prohibited. Well, now you're getting the conclusion. What you're telling us is all you wanted was a compatibility study. Period. Yes, Your Honor. Is that true? Yes, Your Honor. So if the mayor agreed to it, why are we in court? Where's the controversy? The mayor then refused to do it. The mayor and board of trustees, as pleaded in our petition, after making that commitment, agreeing to our interpretation of the statute, refused to conduct the analysis. We sought mandamus. We sought declaratory judgment confirming through the courts what the mayor had already agreed to, that this was required, seeking an injunction maintaining the status quo until the writ of mandamus could be issued, which would compel the city to perform, the village, to perform the feasibility and compatibility study. That's all we asked. All of which arises out of the comprehensive plan. It results from the comprehensive plan as specifically implemented. Again, that word implemented is in the statute and the case's ordinance. The entire chapter on zoning specifically references it was done to regulate lots, structures, and uses so as to implement the 2000 comprehensive plan. It had to be implemented. It was implemented. And we don't have to guess about what that means in terms of the study because the comprehensive plan laid out FAR part 150, the specific requirements of exactly how to do this. So we're not even asking for the city to make it up as they go. They've already agreed that the right way to do this is FAR part 150. That's all we've asked. Returning briefly to my notion of duty, the issue of duty in 2619 can't be raised. For the sole issue that the only affirmative matter is standing. Duty is an element of our underlying claim, and the defendants cannot introduce outside evidence in an attempt to contravene elements of my underlying claim when they've already admitted to the sufficiency of those claims under 2619. In the limited time I have left, the 2615 analysis is more straightforward. It alleges we failed to plead facts in our 120-numbered paragraph petition from which we've stated the elements of mandamus, declaratory judgment, and injunction. We have argued that we do. As the Court has already gone into, the primary argument under 2615 was have we pleaded facts under which there is a duty. We have set forth that duty and the facts that support it with reference to comprehensive plan, the decision to implement that plan. What the defendants have argued is they've attempted to bring outside matter into the case. They reference a comprehensive plan of 2014 and invited the Court to go from the pleading stage into the merits, to review both plans, to reconcile the plans, to reconcile the admission of the mayor on behalf of the village, which was made three years after the 2014 comprehensive plan. Our position is no outside matter can be considered on a 2615 motion. The Court should look only to what was actually pleaded. When the Court does, they will see that we pleaded a duty, a right to relief, the ability of the village to comply. We have pleaded representative standing and an interest in the case, an opposing position on behalf of the defendant, and an actual controversy. We have pleaded irreparable harm. We have pleaded inadequate remedy law and the facts that back those up. Consequently, a dismissal with prejudice under a defective pleading standing standard wasn't proper. Thank you, Your Honors. Thank you very much, Your Honor. Mr. Jackstadt. May it please the Court, Mr. Mellow, good morning. Good morning. My name is Robert Jackstadt, and I represent the defendant appellee village of Bethalto, the defendants in this case, which include the village of Bethalto, the mayor, and the six elected trustees. We're here today to ask that this Court affirm Judge Alfred's decision dismissing this case. First, because a matter of law, the plaintiff lacked standing, and second, as a matter of law, they had no duty to act as claimed by the plaintiff in this case. There are several cases cited in our brief that support the lack of standing. The first one I'd like to talk about is the 1956 Supreme Court case of Garner v. DuPage County. First, tell me, he's saying that Faulkner is still good law. Can you distinguish Faulkner? Yes, Faulkner involved a perpetrator in a road. This case does not involve a perpetrator in a road. A what? A perpetrator. It's an object that's in the road, I believe. You don't have a chance to use that very often. You know, in this docket, I've learned two new words. Not in this case, but in this case and in another case, I learned two new words. It's a 1908 case. I'm looking at it. It's still not been overruled, but I think what the Court needs to do is take a look at the more recent decisions and how... Can you distinguish it then? It involved a more absolute duty, and in this case, the duty being alleged... What made it more absolute? Is that the public safety, there's something in the road that required... So there was more of a high probability of injury. Yes, Your Honor. To the public. Yes, Your Honor. As opposed to the speculative nature of seniors falling out of the sky. Exactly, Your Honor. Okay. The Garner case, you know, as it stated, the appellants had failed to prove that they had a damage which was different from the general public. And I think that's the principle that is being carried on, at least from 1956 on to the present. You also have the Swain v. Winnebago County case, a 2nd District 1969 decision, where, once again, the factual allegations did not support that they had suffered any special damage from the change of zoning, which was different from that of the general public. And, of course, now, as this Court relied upon in the P&S Grain v. Williamson County case, now the Illinois Supreme Court in 1988 has, in essence, simplified the concept of standing. In here versus Illinois Housing Development Authority, the plaintiffs were residential property owners that sued in an effort to stop a development. And in that case, the trial court actually dismissed the case. And the appellate court in the Supreme Court affirmed, reversed, sending it back, saying they did have standing. And although earlier the court found that there was standing, they set forth pretty much a fairly simple analysis with respect to standing. One who is adversely affected, in fact, by governmental action has standing to challenge it. One who is not affected, in fact, lacks standing. It is our position that the Greer Supreme Court case now controls standing in the state of Illinois. And to the extent Cedarhurst plaintiff relies on cases that predate Greer, we suggest Greer impliedly overruled Faulkner in all cases. What do you think the word, in fact, means? Do you think there has to be a cognizant injury? Yes. There has to be a realistic pleading that they have been damaged in fact. What does that mean? Does that mean an injury? For example, Faulkner, there was something in the road. There was an obstruction. And they weren't clearing the obstruction. But the court there held that it was the threat of the obstruction. They were acting as, you know, a public citizen saying we can't have this in the road. So do you think that Greer changed that to now say there has to be an injury? Yes, Your Honor. I do believe Greer supports the position that there must be more than that mere general potential damage. Okay? It must be more specific in fact. So you're saying it essentially has to have taken place? It has to be more than just this general threat to the public as it can't be a private attorney general type action. It needs to be, you need to plead that they have in fact a special damage. In fact, they're damaged. There's no claim other than residency about standing. They haven't pled that they've been economically impacted. They haven't pled any of that. Nothing except this broad speculative nature of planes falling out of the sky and landing on this development. That's not enough. The McKeon 2000... Let me ask you, if there had been a study that showed that it exceeded the noise level, would that be an impact? Harm? I don't believe so. I think they would need something more to establish standing in the grid. The argument that we're proposing and we're suggesting in this court is that the cases predated Greer had been impliedly overruled. That was specifically addressed in McMahon v. Dart, McKeon v. Dart, 2015, the public court decision, first district. They adopted that. They actually said that in their finding, in their opinion. And that's the position we're taking with respect to these old 282-year-old cases that predated World War I, is that Greer is now the standard on standing. We also believe that the court need not go any further than dismiss and uphold the dismissal based on standing. If the court finds no standing, you don't need to go any further on this case. And we suggest that the applicable recent Illinois court decisions suggest that Plaintiff does not have standing in this case. Even if you did assume they did have standing, as the court has asked questions earlier during Appellant's argument, there is no specific duty to act as claimed by Plaintiff. First of all, the Comprehensive Plan of 2000, as the court is aware, by statute, is advisory only and not construed to regulate or control the use of private property. And more importantly in this case, as Judge Alford found, the village never adopted an ordinance to implement the concepts articulated in general by the Comprehensive Plan. They never adopted an ordinance to evaluate developments near the airport according to FAA regulations. They never adopted an ordinance to base the regulation in its overlay district on FAA guidelines. That was at most, as Judge Alford pointed out, they had a place held in their zoning laws, but they never acted on it. They never exercised that legislative discretionary decision to actually put it in an ordinance. So there is no duty to act as claimed by the Plaintiff to have these plans analyzed under the FAA rules. The Comprehensive Plan is advisory. It's aspirational at most. Most importantly, the record supports that the 2014 Comprehensive Plan, which is restated and amended, is the plan in effect at the time of this particular project. And that was properly before the court, it's properly available, and in the amended and restated plan, there is no discussion at all that we can see that discusses, you know, developing an airport overlay district or any of the other allegations made by the Plaintiff in this case. Mr. Jack Stassi, the Greer case that you cited indicated that standing requires only some injury in fact to a legally cognizable interest, whether actual or threat. So I'm not sure that Greer stands for the proposition that there has to be an injury in fact, which is why I had asked you about that. I think that the Supreme Court recognized in Greer that it could be a threatened injury. Right. If you disagree, that wouldn't overrule then Faulkner. It stands for the proposition that still the Plaintiff must have some injury that distinguishes it from the general public. And I think that's the issue. That is separate from the damage allegedly suffered by the general public. And in this case, their argument is lives are at stake. That's a general issue. They're not stating that there is a particular damage to Cedarhurst that is legally recognizable. How is Cedarhurst's position different than the general public? There's nothing palpable, special about their position as opposed to the general public. But maybe I'm confused. Isn't that why they're bringing this? Is it because they're saying that the authorities have a duty to the general public and they're not complying? And there's been something before? That may be their theory. I don't know why they're bringing this action. However, the duty is not there as Judge Elford. That's why I think we get to duty. We get to duty, but there is no specific duty. He alleges that the plan was adopted in 2000. First of all, it's not the plan in place at the time of the budget. And second of all, the statute, Illinois law, says that these are advisory only. He can't point to any ordinance that says we have a specific duty to prevent this type of development, this cost of an airport. It doesn't exist. What about his representation with the mayor of Reed? What was that about? Well, whether he said or she said or whatever he said about it, I think it ignores a misstatement issue. Wasn't it he said, she said that we don't really get into? Well, here's the thing. I'm going to take it as true, because that's the purpose of this motion we did. The mayor of the village president does not have the legal authority to change unilaterally the federal zoning ordinances. This project is moving forward because it meets the general commercial zoning area. It's proceeding. To take their position is the village president could unilaterally change a decision made by the village board adopting the general commercial district, which is not an admission by law that could change this outcome. Well, that's what I was getting to when I was asking the earlier questions. It seems like the fall show has a lot to go through before they can even approve this kind of bill. Maybe that's not clear in the record. There's nothing in the record that suggests it went through a process. For example. I guess that's my own assumption. The Behalto resident submits a plan to build a new residential piece of property, a home. If it meets the requirements of that building permit application process, the village of Behalto ministerially approves that plan. Thus, in this case, when he comes, submitted a plan that met the general commercial business district rules, the building permits were issued. There was no process going through the planning and zoning of the village board. So it's really in my position. It's a red herring to talk about what the mayor may have or did not admit with respect to this project. But then that may help his argument that there was no, I mean, that it was perfunctory. In fact, there was something in place that required issuance of this permit. In other words, there were things that mandated issuance of the permit. Maybe it wasn't as fluid as I'm thinking it was. That helps him maybe. But that has not been pledged. He's pledged that it should have gone through the process with the FAA regulations. You're right. I'm sorry. I just think that in this situation, the mayor's comments would not be relevant under Illinois law. Thank you, Your Honor. So unless there's any other questions, the Behalto defendants would respectfully request that this court affirm Judge Alfred's decision, one, based on standing, and two, because there was no legal duty required of them to act in the manner claimed by the plaintiffs. Thank you very much. Thank you. Nobono? Your Honor, I think two things are important to emphasize from the argument of the defendants. The first was the explicit concession. I'm sorry. I can't hear you. Two points I'd like to make, Your Honor. I apologize. Okay. This doesn't amplify. The most important of those points is that they've conceded Faulkner v. Harris, and those other cases which have applied it, again, from 1849 through 2002, has never been overruled and is good law and controlling law in Illinois if this case falls within that narrow boundary. That should be beyond dispute. I did not hear him concede that. He did concede it's never been overruled. His only argument was it was impliedly overruled in a First District case called McKean v. Dark, which if the Court has not read, if that's what the defendant is grounding its entire case on, I encourage you to read it. It involved a pro se plaintiff filing a somewhat unintelligible claim in Cook County on which he lost. He then tried to appeal. The appellate court, with some degree of disheartened approach, says the appellate brief was insufficient. The appellate brief was struck. The appeal was decided based on the pro se appellant's inability to put forward a brief that met the appellate court rules. The most that happened was in passing the course made reference to a single allegation that that pro se plaintiff had said, I'm a citizen of Cook County. And the court said to the extent that would otherwise require us on to this other law to go forward, he hasn't articulated or demonstrated it either below or in his appellate brief. So there's nothing in this case that impliedly overrules any aspect of that line of cases. Well, tell me, going back to 1903. Yes, ma'am. What is the high probability of injury here? Because if we're talking about it not being overruled, I'm trying to then line it up with current law. Yes, ma'am. What is the high probability of harm in your estimate? We have pleaded that this proposed development is in the 65 LDN noise contour. We have pleaded that under FAA regulation part 150, it says unequivocally that sort of development is per se incompatible. The mayor's admission, again, is consistent with the application of FAR 150 that it is, for purposes of pleading, it has to be taken as true. It is in the noise contour that makes it incompatible. The analysis would have established that. The analysis wasn't done as a result. And it will harm you how? It would harm the community. We are in danger of exactly what happened when 132 residents, which were farther from the airport than this proposed development, were mandatory bought out and demolished. The village said, let's not do this again. Let us prospectively look at these things before they're built, not after. If they are in the 65 LDN, let's adopt FAR part 150 and stop these in their tracks. How are they harmed? You're going to be tearing down homes needlessly, or you're going to be causing too much noise, or planes are going to fall. What is the harm that you're talking about? There's two full harm. One, residents of Bethalto are those individuals who are going to be living in this memory care full-time residential facility. They should not have to be subjected to these noise violations. Second, the village of Bethalto. So excessive noise. But that's assuming this gets built. Yes, ma'am. Okay, so excessive noise is one, and what was the other? If this program is, if this is constructed and it is in violation, at that point, any number of people under other existing standing doctrines could move to have the occupancy permit denied, to have the facility. Could, could, could, but now that's speculative. Anybody moving, if a permit gets issued and then it's wrongfully issued, then you have litigation on whether it should or should not have been issued, that seems to me far from an injury. That is a risk that the village has decided it does not wish to take on post hoc. It has decided to tackle this first and not let this get built and engage in post hoc analysis when we know now that this particular structure is in the 65, proposed structure is in the 65 LDN. That's why they said we need to look at this now and not let it go further. Consistent with the Faulkner cases, that is a duty that the village of Bethalto owes to its citizens and there is standing of any of those citizens to say do your job, do the analysis. As far as this admission, one other quick thought. Again, this issue of duty comes only under 2615. You cannot challenge the existence of the duty under 2619 because it was conceded by the basis of that motion. So under 2615, it's the only place duty comes in and if we have pleaded the existence of the duty and they introduce outside evidence to leave that on the merits, it takes it outside 2615, it makes it a decision on the merits which is improper for dismissal with prejudice under 2615. Thank you so much for your consideration. Okay, thank you very much. This matter will be taken under advisement and disposition will be issued in due course. Thank you both gentlemen.